UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X   14 CV 6865 (LDH) (RLM)
GLORIA GORHAM,

                           Plaintiffs                **FINDINGS OF FACTS AND**
-against-                                        **CONCLUSIONS OF LAW**

P.O. DIMITRY BRUSHNIVSKY, P.O. ANDREW LASSEN
and P.O NICHOLAS SCALZO,
                          Defendants
-------------------------------------------------------------------------------X

# FINDINGS OF FACTS

BACKGROUND

On August 25, 2013, a party was held at the residence of Sadie Miles, for her deceased daughters and a birthday for her grandaughter Ashanti Gorham. Atttending were family members who testified at trial including the plaintiff, her daughter, Gloria Gorham, the mother of Ashanti, Deniesha Lee, her granddaughter, who testified at the trial and perhaps 10 more family members and some neighbors. There was an outdoor barbeque, some music and no alcohol served except for Saide Miles who had some beer. Around dusk her nephew Marvin Graham was outside the gate when he was stopped by two police officers for an open container of beer including the defendant Nicholas Scalzo and officer Thomas Murphy who was an original defendant whose case was resolved. Thereafter, the defendant officers Dimitry Brushnivsky and Andrew Lassen arrived in different patrol cars as they responded to a call to assist. The partner of the defendant Lassen, officer John Fabrizio, who had been a named defendant whose case was resolved also arrived. There are facts that really aren't in dispute such as initially one patrol car arrived and the officers encountered Marvin Graham outside the fenced in area where a party was taking place, and at some point the police were returning to their patrol

1

cars and the plaintiff and her family were going back to their house. There are facts that are disputed but are inconsequential to the main issue such as did the officers put their hands in Marvin's pockets when the search of him was conducted. Did Marvin have a cup or a can of beer in his hand also is disputed and cannot be resolved but doesn't impact the Court's ultimate determination. Additionally, the plaintiff claims that after the excessive force was used in arresting her she was thrown into the door of the patrol car causing the window to break while the defendants and other officers testified that she kicked in the window injuring the defendant Scalzo. The plaintiff is not claiming that any injuries to her feet or laceration to her leg. Therefore this incident occurred after the use of excessive force during her arrest.

In setting forth the conclusions of law it is necessary to make a determination as the totality of circumstances that were testified to enable this Court to determine the question of the reasonableness or unreasonableness of the defendants' actions. In order to apply the law regarding the objective reasonableness of the defendants actions it is necessary to determine what their state of mind was when they committed those actions and therefore it is necessary to examine all of their testimony during that evening to determine whether their actions in using force against the plaintiff were reasonable or not.

**TESTIMONY OF THE DEFENDANTS AND OFFICERS MURPHY AND FABRIZIO**

Defendant Lassen testified that on the night of the incident he was partners with Police Officer Fabrizio . He observed, an elderly woman, Sadie Miles come out to scene and try to calm the crowd down. TT 300:4-12  He didn't get back in the car to leave the scene because he observed the elderly woman pushed to the ground. TT 300:17-22 . He then went to assist the officer who was arresting Ashanti to handcuff the plaintiff who was on the officer who was

2

trying to handcuff Ashanti. He placed his hand on her arm to cuff her and she then threw her arms up in the air.  He had difficulty as she was throwing her arms around and he managed to take her to the ground with the help of another officer.  He lifted the plaintiff up and she was then taken to the patrol car by Scalzo. TT300:25-303:8

The defendant Scalzo testified that it was  he who grabbed the plaintiff off of Murphy and that  she stood up and flailed her arms and he was facing her back and she was pulling away from him, trying to bite him so he was concerned that she would be able to  get away.  In order to startle her  he hit her with a fist in her back which was successful and she was cuffed and walked to the patrol car.  tt  275:3 – 277:2   Scalzo also testified that he had to pull the plaintiff off of the head of his partner Murphy who was struggling to handcuff Ashanti.  TT 288:17-20

Murphy testified that he had grabbed Ashanti by her ankle and dragged her to the park and  after he cuffed her she was sitting down and he had his hand on her shoulder.TT 228:1-9, 233:15-17.  Murphy further testified that Gloria had come to where they were and put her hand on his wrist twice which he removed  twice and had then directed Scalzo to arrest her.  TT 233:17-234:16

Defendant Lassen testified that it was he and officers Fabrizio and Ustick that  brought plaintiff to the ground in order to handcuff her.  While she was on the  ground  on her stomach he brought her arm behind her back to put on the handcuffs. TT 315:9-18.   Officer Fabrizio testified that he had no knowledge about how the plaintiff was handcuffed TT. 200:13-15  or where Scalzo and Murphy were when that took place.   Furthermore , Officer Fabrizio who was some 10 to 15 ft away saw the old lady was pushed  and  that it might have been an elbow and it could have been accidental.  Furthermore the lady didn't fall to the ground.  TT  199:12-25

3

Officer Murphy testified that he observed the plaintiff and Ashanti fighting , waving arms and pulling hair and one of them pushed Sadie Miles to the ground. TT 218:5-19 . Furthermore, Murphy acknowledged that in Exhibit 11, the criminal complaint, he documents that Ashanti was being arrested for pushing down Sadie Miles.  He then denied that he hadn't seen who had pushed her down. Tt 220:1-5

Lassen, on cross examination testified that in his deposition testimony wherein he had testified that it was Gloria that pushed Sadie Miles to the ground with a two hand push he realized when Ashanti testified she and not Gloria pushed her . TT 308:3-309:24   He also indicated that there was a fight that involved Sadie Miles and two others , one of them being Ashanti.

**THE  TESTIMONY OF THE FAMILY WITNESSES AND THE  PLAINTIFF**

**SADIE MILES**

After  the initial confrontation between the police and Marvin she was walking back to the party between Ashanti  and  Deniesha when the police officers jumped out of their car and came running up to where they were and yelled " let's lock them up" whereupon Ashanti was knocked down and taken to the park area where she was thrown up against the fence.  She heard her crying out and so she went to get Gloria. TT 35-1-36-8   She testified that she observed Gloria in the area where  Ashanti was taken and believes that the police were on Gloria as well. She also was directed on cross examination to a statement she had made to CCRB where she said Gloria had tried to grab the officers off of Ashanti and that was nothing more than what she

4

would have done. TT 74:19-75:9  She also was impeached during cross examination concerning whether when the police ran up and grabbed Ashanti they said that she had hit her. TT 69:10-14

She categorically denied that any fight was going on between Gloria and Ashanti or that anyone in her family had pushed her to the ground as testified to by the defendants. TT 39:11-13

**ASHANTI GORHAM**

After the initial incident with Marvin she did observe her mother talking with the police and they telling her to" mind her own business, cunt." TT 104:2-12.  Ashanti testified that she was walking back to the house with Deniesha and her grandmother.  Her grandmother, Sadie Miles was between them and they got into a loud argument and got into each others faces.  Deniesha had raised her hand in her face and she had pushed it away.  No blows were ever struck between them.  Neither of them had struck or thrown their grandmother to the ground. Tt105:5-106:5

She was then grabbed by Officer Murphy who dragged her to the park area where she was thrown up against the picket fence.TT 106:10-107:14   She observed the plaintiff in the vicinity where she was and four or five officers were on her and she did hear her yelling for them to get off of her.  One was pulling her arm back behind her and one had his knee in her back. TT107:15-118:2   Because of how she was positioned she was not able to determine if the plaintiff was trying to grab officer Murphy off of her.   She testified that she did observe the officers throw her into the patrol car door and glass break.

After they were taken to the precinct she observed an officer push the plaintiff's head onto a desk and saying she was an "animal." TT 110:4-9

5

She testified on cross examination that she and Deniesha were in each others faces when the police ran up and dragged her away. TT 119:15-20   She also testified that her mother began shouting to "get off of her." TT 121:16-21.   Ashanti also testified on cross-examination that she couldn't see what her mother was doing because she was pinned up against fence.  TT 123:9-15

**DENIESHA LEE**

Deniesha had been engaged in a conversation with her father when the incident with Marvin had taken place and she had observed her grandmother, Sadie Miles, lying on the grass and she sat her up. Thereafter Deniesha talked to the police who were around them, about the party and what was going on and seemingly had defused the situation that had begun with Marvin. TT 82: 3-84:3  She had seen  Ashanti as she was walking back to the house the three of them went back towards the house.

She and Ashanti got into an argument about how to deal with the police and that Ashanti had pushed her hand away from her face.  No  blows had been struck and neither of them had pushed or struck Sadie when out of nowhere she saw Ashanti tackled and then she was tackled down from behind. TT 84:21-85, 86:10-24

She was able to observe the defendant Brushnivsky ,with a bald head, punching the plaintiff in the park area. TT 87:5-18   She was being punched as many as ten times and was blocking some of the blows to her arms, abdomen and face before she fell to ground .   Deniesha did not observe anything further as she was arrested and taken away from that area. TT 89:15-90:7

**GLORIA GORHAM**

6

The plaintiff testified that while Marvin was being searched she had approached the officers as her intent was to see what was going on and when they asked for his ID she told them that he was with them at the party and that he had rights .   They told her to mind her " fucking business , ."   TT 132:4-23

She was directing her remarks to the defendant , Scalzo who also called her a cunt. TT 133:10-19

Her mother, Sadie Miles came over to them and spoke to the officers and  she calmed down the situation.   She told them to get back to the house so they left   and she was in front of her mother and Deniesha and Ashanti. TT 133:20-134:17   She then heard Ashanti say Mom he's hurting me", whereupon she turned and saw daughter being dragged by the arm by Murphy.  Her natural reaction was to run towards them to help her and to get him off her. TT 134:18-25

However before she got to where Murphy had her the defendant, Scalzo, stepped in front of  her and pushed her back by shoving her in the chest and when she ran forward a second time he did it more forcibly and that was more painful.   Thereafter the bald headed officer, Brushnivsky , punched her on the right side of  the face  and  she fell to the ground after several blows.  TT 135:18-136:17  She had tried to defend herself but she  was on the ground with five or six officers on top of her, including the defendants Lassen, Scalzo and Brushnivsky. TT 138:1-7

After she fell to the ground and lying on her stomach, Lassen had his knee in her back and her arm was twisted back so that she was crying out"  don't break my arm,   don't break my arm."  She was certain that three defendants were the officers involved in administering the blows which included kicking and punching and using the derogatory language.  They were calling her bitch, cunt, nigger, animal.  Altogether there were 5 or 6 officers on her.  She testified

7

it seemed like it went on for an eternity but could have been five or twenty minutes. She felt disrespected, helpless and confused. TT 138:17- 140:19

She testified that she was lifted up by the cuffs, TT 140:25-141:3 was then taken to the patrol car barefoot and thrown up against the rear drivers side door where her chest smashed into window causing it to shatter. TT 142:1-5. On cross examination, TT 168:2-8, she had indicated in her deposition testimony that she was yanked up by her arm .

At the 121st precinct she was brought up to the desk in cuffs be Lassen who pushed her face into the desk causing pain and further humiliation and she was called animal and the officers were laughing and she felt that she was their entertainment. TT143:12-144:8

She was then taken to Staten Island Hospital South where it was recorded that she complained of the head pain, like pressure mainly on the right side, from being punched there and the severity being moderate. TT 147:5-12 She had contusions and abrasions. The wrist pain from Lassen twisting her arm back . She testified regarding the closed head injury diagnosis that she had some bruising on the right side of her head and she still gets headaches. TT 150:2-10. On cross examination TT 164:11-16 , she testified that she had only been seen by nurse not doctor at hospital.

She also sustained an injury to her elbow and was treated by Dr. Lamia. She had sling put on in the ER and was treated by Dr. Lamia on August 30th some five days after the incident. She wore the sling for 15 days. TT 150:25-151:1 A photograph, Exhibit 2, was taken the next day, after the incident. TT 151:2-18

Referring to Exhibit 14, which was Dr.Lamia's office record , she testified that she suffered an injury to her elbow which is diagnosed as sprained with some edema . It says she has

8

difficulty sleeping due to the pain. She testified that this lasted for a few months. She also had wrist pain which was tender on palpation, right and left wrist sprain and multiple contusions. The wrist pain lasted a few months and her thumb numbness a few weeks. The contusions dissipated as well.TT 153:6-24.   On cross examination she testified, TT 183:19-184: 8 that she had treated with Dr. Lamia previously for headaches but they are now more frequent.  There is also no mention TT 186:10-14 of a head injury in Dr. Lamia's record.

     She further testified that she suffered emotional trauma that disrupted her life and that she still deals with on a regular  basis,   that she continues to deal with and disrupts her life.  She was treated as if she was  inhuman and she still is confused as to why this happened and makes her feel overwhelmed. TT 154:3-17

She  testified that she was charged with felony assault , resisting arrest, destruction of government property.  She plead guilty to a violation, disorderly conduct , because she had no faith in the system and was concerned  about future employment.  She got her job at the bank after this incident. TT 154:23-156:12.  There was no evidence introduced of an allocution to the disorderly conduct.

**STATEN ISLAND HOSPITAL SOUTH  RECORDS EXHIBIT 1**

She presented with  head pain and right wrist pain

There was an entry that indicated she had cuts to her feet and laceration to her leg

These records indicate that an assessment was made by Dr. Gregorio Alvarez in the morning of 8/26/13

9

His diagnosis was that the plaintiff had contusions to her wrist, multiple abrasions, and a closed head injury.

There is a note in her discharge that the plaintiff wanted a Cat Scan of her head

### DR. LAMIA'S MEDICAL RECORD  EXHIBIT 14

This record on 8/30/13  contains entries that indicate that she had sprained tender left elbow with some edema and a splint.  That she can't sleep due to the pain.  That she had a right and left wrist sprain. That she had multiple contusions and her left thumb was numb.  That her left arm x-ray was negative.

### CONCLUSIONS  OF LAW

### THE EVIDENCE INTRODUCED AT THE TRIAL  REGARDING  THE ARREST OF THE PLAINTIFF BY THE DEFENDANTS SATISFIES THE STANDARDS SET FORTH BY THE SUPREME COURT AND THE SECOND CIRCUIT THAT ESTABLISHES THAT HER FOURTH AMENDMENT RIGHTS TO BE FREE FROM UNREASONABLE SEIZURE  BY EXCESSIVE FORCE HAD BEEN VIOLATED.

The seminal case rendered by the Supreme Court that  that set the standard for the evaluation of Fourth Amendment violation due to excessive force during the course of an arrest is *Graham v Conner,*  490 U.S. 386.(1989)     The crux  of that decision was that the analysis of the actions of the police has to be based upon an objective reasonableness standard as set forth by Justice Rehnquist at p.51

Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether

10

the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. See Tennessee v. Garner, 471 U.S., at 8 -9 (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

Therefore as the Court stated above since each case has its own unique characteristics we have to examine those circumstances to answer the question of the reasonableness of these defendants actions in arresting the plaintiff. Therefore in making a determination as to their credibility it would be necessary to determine whether these defendants lied about any aspect of their involvement at the scene of the incident concerning their involvement or any other aspect of what took place. Since the credibility of these defendants is so crucial in determining their reasonableness or unreasonableness in deciding what actions they actually were engaged in, the totality of circumstances analysis mandates a thorough examination of what was taking place during the entire incident.

The testimony given by the civilian witnesses and the testimony elicited from the police officers is consistent in some regards and at odds in other crucial areas of inquiry. Regarding the seriousness of the crime, the initial incident involved an open container of beer, the plaintiff was unarmed and that whatever crowd there was the police officers were never in danger. The only alleged violent act as asserted by the defendants was that the plaintiff kicked in the patrol car window, injuring a defendant Scalzo and even assuming that occurred, that took place after the excessive force was committed by these defendants.

This case unlike so many does not involve a potentially dangerous criminal who might have a weapon and who resists during the course of his arrest. As set forth in the statement of facts at most according to Murphy the plaintiff put her hand on his wrist twice while her daughter was sitting on the ground with Murphy's arm on her shoulder. The defendant

11

Scalzo's testimony contradicts Murphy as he claims that he had to use force to pull the plaintiff off of Murphy's head while Murphy was struggling to handcuff Ashanti Gorham. We can logically and fairly assume that if the defendant Scalzos version were true then Murphy would have so testified. The logical inference that this Court can draw is that the defendant Scalzo lied about the plaintiffs use of force in order to justify his use of force in subduing her. This Court also has to consider in evaluating the reasonableness of these defendants actions during the course of the arrest what were their actions prior to the arrest of the plaintiff in assessing the reasonableness of their actions and what a reasonable police officer under the same circumstances would do.

Therefore it is important for this Court to consider the circumstances surrounding the initial use of force that was employed by the police officers because it seriously impacts their credibility as to all aspects of their actions under the objective reasonableness standard as regarding the totality of the circumstances. The Court has to ask the question as to what was precisely going on because that would impact the decision making process of the "reasonable police officer" under those circumstances. These defendants and the other police officers but for officer Fabrizio testified that they had to intervene and use force to arrest Ashanti because they had observed her forcibly push her grandmother, Sadie Miles to the ground. Officer Fabrizio, who was close to the action thought there might have been some pushing but he never observed Sadie Miles on the ground and that whatever contact took place might have been accidental. His testimony cannot be reconciled with what these defendants have testified to. This Court can reasonably conclude that had Sadie Miles been deliberately knocked to the ground by Ashanti he would have so testified. So this Court has to ask the question what actually was taking place that the reasonably acting police officer would have been

12

confronting. The evidence was that two unarmed female cousins were arguing with each other with their grandmother between them and posed no danger to these officers nor did it provide a basis to seize and arrest them.

Therefore it is reasonable for this Court to conclude that these defendants concocted such a story to cover up the fact that they knew that they had no right to seize Ashanti Gorham or Deniesha Lee or anyone else. It is further reasonable for this Court to conclude that when evaluating the seizure of the plaintiff that the testimony of these defendants is similarly contrived in order to justify the amount of force that they claim was necessary to subdue the plaintiff. Therefore this Court has every right to conclude that even assuming that the plaintiff put her hand on Murphys wrist as he testified these defendants over reacted and used disproportionate force to her action of placing her hand on Murphy's wrist when effectuating her arrest. Certainly the force was disproportionate according to the plaintiff's testimony that before she could even get to where Ashanti was located in the park these defendants knocked her to the ground proceeded to punch and kick her.

In conclusion regarding this objective reasonableness evaluation it is fair to say that no reasonably acting police officer given the circumstances herein would have reacted with the violence that was exhibited against the plaintiff. No reasonably acting police officer under the totality of circumstances herein would have created such a tumultuous scene over two cousins arguing and a mother trying to aid her daughter whose seizure was unwarranted and unnecessary. No reasonably acting police officer would have used the force these defendants did in effectuating the arrest of the plaintiff even if she was trying to help her daughter by grabbing Murphy's wrist. Therefore, the plaintiff proven that the defendants use

13

disproportionate force to the totality of circumstances that they faced when arresting the plaintiff in violation of her Fourth Amendment rights.

## THE EVIDENCE THAT WAS INTRODUCED CONCERNING THE INJURIES SUSTAINED BY THE PLAINTIFF DURING THE COURSE OF HER ARREST WAS SUFFICIENT TO ESTABLISH A FOURTH AMENDMENT VIOLATION OF EXCESSIVE FORCE

The Second Circuit Court of Appeals has ruled in numerous opinions, that the injuries claimed by the plaintiff herein and the evidence submitted would be sufficient to establish that excessive force was used. In frequently cited case, *Robinson v Via,* 821 F.2d 913, (1987), the Second Circuit Court of Appeals held the following regarding the seriousness of the injury and proof submitted,

> **Robison's assertions as to the use of force by Harrison were not so meagre. She testified that Harrison "pushed" her against the inside of the door of her car, "yanked" her out, "threw [her] up against the fender," and "twisted [her] arm behind [her] back." Robison testified that she suffered bruises lasting a "couple weeks." We have held that assertions such as these are sufficient to prevent the summary dismissal of a Sec. 1983 claim for excessive force. See Bellows v. Dainack, 555 F.2d 1105, 1106 & n. 1 (2d Cir.1977).**
>
> **In Bellows v. Dainack, the plaintiff contended that the defendants had used excessive force against him by twisting his arm, pushing him into the back seat of a police car, pulling him by the scruff of the neck, and striking him in the ribs. The jury returned a verdict in plaintiff's favor. On appeal, the defendants contended, inter alia, that these assertions were insufficient as a matter of law to state a claim under Sec. 1983. We explicitly rejected this contention. 555 F.2d at 1106 & n. 1.)..... In sum, Bellows stands for the proposition that assertions virtually identical to those made by Robison under oath at her deposition will, if accepted by the jury, suffice to sustain a claim of due process violation through the excessive use of force.**
>
> **While Robison did not seek medical treatment for her injuries, and this fact may ultimately weigh against her in the minds of the jury in assessing whether the force used was excessive, this failure is not fatal to her claim. If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe. See Norris v. District of Columbia, 737 F.2d 1148, 1150-52 (D.C.Cir.1984); Bowman v. Casler, 622 F.Supp. 836, 838 (N.D.N.Y.1985); see also Bellows v. Dainack, in which the description of the events did not suggest that plaintiff had been seriously or permanently injured.**

14

The crucial question as set forth in this opinion is whether the force used was unreasonable and excessive under the particular circumstances that confronted the defendants not the magnitude of the injuries that were inflicted.

The Second Circuit in, *Calamia v City of New York*, 879 F.2d 1025, further elaborated on the question of whether the physical injury suffered during an arrest would be sufficient to meet the criteria of a Fourth Amendment violation due to excessive force. The claimant, Calamia was thrown to the ground and tightly handcuffed for a long period of time. In reversing the holding of the District Court, the Court of Appeals cited the decision in *Graham v Conner,* as providing the standards to make such a determination.

**Thus, a proper assessment of whether the force used was excessive requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.**

**Id. The Court held that because Graham's excessive-force claim arose under the Fourth Amendment, he was entitled to have the jury consider that claim under the objective reasonableness standard.**

**Nonetheless, though the instructions on the excessive-force claim were flawed, the evidence of record sufficed to warrant submission of this claim to the jury and to warrant denial of Sutton's motion for judgment n.o.v. The record showed that as soon as Calamia answered Sutton's knock at his door, Sutton shoved him to the floor and immediately cuffed his hands behind his back. There was evidence that the handcuffs were unduly tight, and though Sutton argues to us that Calamia's discomfort was "momentary," Calamia testified that he was kept in this painful condition for five or six hours before being taken to the police station. It was for the jury to determine whether Sutton's conduct in connection with the arrest, pushing Calamia to the floor and causing him to remain there in a painful posture without circulation in his hands for many hours while the officers collected the property was, as an objective matter, reasonable. The denial of judgment n.o.v. on this claim was proper.**

In a decision rendered in the Eastern District of New York, in 2013, *Graham v City of New York*, 928 F.Supp 610, 618, 2013, Justice Brodie set forth in her decision a multitude of decisions that confirmed that the allegations of excessive force need not have resulted in significant injury or even medical records, at 618,

15

Defendants are liable as long as the force used exceeded the force needed for the factual circumstances and the fact that Plaintiff may not have sustained serious long lasting harm is not dispositive. *See Hayes v. N.Y.C. Police Dep't,* 212 Fed. Appx. 60, 62 (2d Cir.2007) (summary order) ("[W]e have permitted claims to survive summary judgment where the only injury alleged is bruising."); *Hayes v. County of Sullivan,* 853 F.Supp.2d 400, 432 (S.D.N.Y.2012) ("Plaintiff need not show `permanent or severe' injuries to maintain an excessive force claim."); *Lemmo v. City of New York,* No. 08-CV-2641, 2011 WL 4592785, at *8 (E.D.N.Y. Sept. 30, 2011) (noting that "a jury may consider the lack of serious injury as evidence that the implemented force was not excessive;" however, a reasonable jury could still find that any use of force under the circumstances were inappropriate (internal quotation marks and citations omitted)); *Davenport v. County of Suffolk,* No. 99-CV-3088, 2007 WL 608125, at *11 (E.D.N.Y. Feb. 23, 2007) (holding that use of force that causes *de minimis* injury could be excessive force if "gratuitous"); *see also Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 123-24 (2d Cir.2004) (distinguishing the kind of force that can be used in "the arrest of a nonviolent suspect"); *Mesa v. City of New York,* No. 09-CV-10464, 2013 WL 31002, at *18 (S.D.N.Y. Jan. 3, 2013) (noting that "sustained injury that requires doctors' visits is not a necessary element of a successful excessive force claim"). "Under the law, police are not permitted to use any degree of force in all instances — in some circumstances, no use of force is reasonable because none is required." *Weather v. City of Mount Vernon,* No. 08-CV-192, 2011 WL 1046165, at *11 (S.D.N.Y. Mar. 22, 2011), *aff'd,* 474 Fed. Appx. 821 (2d Cir.2012). The Second Circuit has found that forcibly removing a non-violent arrestee from his or her car

Therefore, the inquiry this Court has to make is whether the force these defendants employed in effectuating the arrest of the plaintiff that caused her to suffer a closed head injury, sprained elbow necessitating a sling for 15 days along with abrasions and contusions , exceeded the force necessary for the factual circumstances that existed when they used force during the arrest. The officer who called for her arrest , Murphy ,testified that she had touched his wrist twice when he told the defendant Scalzo to arrest her. A reasonable police officer possessing the knowledge that these defendants knew; that there was a party that these women were attending and that there had been no evidence of violence or threats of violence, they would not have used the force that caused the injuries set forth in Exhibits from Staten Island Hospital and Dr. Lamia. Therefore the defendants did not act as a reasonable police officer would have under the totality of circumstances that existed.

## **THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

16

The Supreme Court first addressed the issue of qualified immunity as it applied to excessive force cases *in Saucier v Katz*, 533 U.S.194. The Court sought to clarify its decision in *Graham v Conner*, regarding the question of excessive force and whether a further analysis has to be made if it was determined that there was a constitutional violation in the use of excessive force so as to further determine whether a reasonable police officer might have reasonably believed that such force was legal under the circumstances even if he was in error. Saucier was a military policeman, on a detail that was protecting Vice President Gore at a rally at a military base when he came upon a protestor named Katz, who was trying to unfurl a banner . Saucier grabbed him and dragged him away from the scene and then shoved him into a van and drove him away. In addressing the issue of whether a further inquiry has to be made the Court stated at 205, 206

The qualified immunity inquiry, on the other hand, has a further dimension. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Graham* does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts. This is the nature of a test which must accommodate limitless factual circumstances. This reality serves

to refute respondent's claimed distinction between excessive force and other Fourth Amendment contexts; in both spheres the law must be elaborated from case to case. Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes "hazy border between excessive and acceptable force," *Priester* v. *Riviera Beach,* 208 F.3d 919, 926-927 (CAll 2000), and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.

In making its analysis the Court ruled that the actions of Saucier in shoving Katz into the van might be excessive under the totality of circumstances but given the fact that he was responsible for protecting the Vice President and his uncertainty as to what else might be going on and the need to remove Katz from the scene quickly, in shoving Katz into the van he could have reasonably believed was justified.

17

In examining the totality of the circumstances herein whereby there was no real threat of danger posed to these defendants by the plaintiff or any others it cannot be said that any reasonable police officer would believe that the beating administered to her under those circumstances would be considered lawful. That is born out as previously stated in that the defendant Scalzo lied when he described the actions of the plaintiff that necessitated his forceful intervention.

There is no basis to hold that in their use of excessive force these defendants had any reasonable basis to believe that their actions were lawful. To the contrary, their obvious contrived testimony to create a false narrative that this plaintiff and the other family members were engaged in violent conduct that justified their forceful intervention signifies that they knew their actions were unwarranted and excessively forceful as it pertained to the plaintiff. They are therefore not entitled to the protection of Qualified Immunity

### **THE PLAINTIFF'S PLEA TO DISORDERLY CONDUCT DOES NOT AFFECT HER 4TH AMENDMENT CLAIM OF EXCESSIVE FORCE**

The fact that the plaintiff plead guilty to disorderly conduct does not impact her claim for the use of excessive during her arrest. No evidence was introduced concerning an allocution where she admitted to any force that she engaged in so as to justify the excessive force that was used against her by these defendants. In *Tracy v Freshwater*, 623 F.3d 90,(2010), the Second Circuit did not even consider dismissing the excessive force claim wherein the claimant had plead guilty to resisting arrest. The fact that someone is disorderly does not mean that the police did not use disproportionate force in effectuating the arrest.

## **THE PLAINTIFF IS ENTITLED TO PUNITIVE DAMAGES**

The awarding of punitive damages in a 1983 Civil Rights claim predicated on the use of excessive force was first addressed by the Supreme Court in Smith v Wade, 461 U.S. 30, wherein at p.51 the Court stated,

> As for punitive damages, however, in the absence of any persuasive argument to the contrary based on the policies of 1983, we are content to adopt the policy judgment of the common law - that reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages.

In this case the actions of these defendants exhibited such deplorable conduct as contemplated in this decision. These defendants had been informed that the plaintiff and the other people were at a family party that clearly did not pose any threat to these officers. Nonetheless they attacked the plaintiff's daughter and niece which set in motion further violence directed at this family. The plaintiff as any mother would tried to help her daughter and comprehend what was happening to her. For her efforts she was pummeled with fists and kicks and had her arm bent back so as to cause damage to her arm. The credible evidence revealed that at most two cousins, including the plaintiffs daughter, Ashanti, were arguing, which triggered the defendants assaultive behavior. Their actions clearly showed both a recklessness and callous disregard for the rights of this plaintiff and all the others.

Regarding an amount which would dissuade these defendants from engaging in such conduct and given the nature of their attack on the plaintiff a sum of $25,000 dollars for each of these defendants would be appropriate.

## **COMPENSATORY DAMAGES**

19

The plaintiff was beaten by these three defendants and her testimony was supported by other witnesses. Her testimony and medical records revealed her physical pain , her initial diagnosis of a head injury, multiple contusions and abrasions , and elbow injury that required a sling for two weeks. She was subjected to racial slurs and then mistreated at the precinct. Her emotional trauma that still impacts her on a daily basis. The medical records as previously set forth do support her testimony certainly more than just a punch in the back as Scalzo testified. Given the totality of what the plaintiff endured an amount of $100,000 would be appropriate

**COSTS AND ATTORNEY FEES**

Should the plaintiff prevail appropriate documentation will be provided to the Court.

Respectfully Submitted,

_____
ANDREW BERSIN (8987)
11 Peter Ave.
Newburgh, New York 12550